# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

United States of America,

             Plaintiff,

v.

James Potter Williams,

             Defendant.

**Criminal No. 12-310 (DWF/SER)**

**REPORT AND RECOMMENDATION**

Laura Provenzino, John Kokkinen, Esqs., United States Attorney's Office, 600 U.S. Courthouse, 300 South Fourth Street, Minneapolis, Minnesota 55415, for Plaintiff.

Shannon R. Elkins, Office of the Federal Defender, 107 U.S. Courthouse, 300 South Fourth Street, Minneapolis, MN 55415, for Defendant.

STEVEN E. RAU, United States Magistrate Judge

The above-captioned case comes before the undersigned United States Magistrate Judge on Defendant James Potter Williams's ("Williams") Pretrial Motion to Suppress Evidence from Search and Seizure [Doc. No. 17] and Pretrial Motion to Suppress Statements, Admissions, and Answers [Doc. No. 18]. This case has been referred to the undersigned for resolution of pretrial matters pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1.[1]

## I. BACKGROUND

The Indictment in this case charges Williams with two counts of receipt of child pornography and one count of possession of child pornography. (Indictment dated Dec. 12, 2012) [Doc. No. 1 at 1–3]. Immigration and Customs Enforcement ("ICE") Special Agents David Hudgens ("S.A. Hudgens") and Thomas Boyle ("S.A. Boyle") testified on behalf of the

---

[1] A separate Order addressed Williams's non-dispositive motions. (Order dated Jan. 25, 2013) [Doc. No. 22].

Government at a pretrial motions hearing on January 25, 2013.[2] (Exhibit and Witness List dated Jan. 25, 2013) [Doc. No. 23]. Seven exhibits were marked for identification and received into evidence: (1) Dynamic Group's Employee Handbook; (2) Dynamic Group's Use of Company Automation Systems Policy; (3) Signed Employee Acknowledgement; (4) Department of Homeland Security Consent to Search Form (2007 Ford Fusion); (5) Search Warrant, Return, and Evidence Inventory and Receipt for 9553 Foley Boulevard, Coon Rapids, Minnesota; (6) Department of Homeland Security Consent to Search Form (13911 Unity Street, Ramsey, Minnesota); and (7) ICE Report on the Execution of Search Warrant at Dynamic Group Precision Molds. This matter is set for trial before the United States District Judge Donovan W. Frank on April 22, 2013 at 9:00 a.m. (Order to Continue Trial) [Doc. No. 30].

## II.    FACTS

This case arises out of a nationwide investigation into the credit card purchase of child pornography from certain websites. After Williams was identified as a purchaser, federal agents obtained a search warrant for his residence, (Tr. at 12), and his employer, Dynamic Group Precision Molds and Molding ("Dynamic Group"), (Gov't Ex. 5 at 1). Federal agents executed the warrants simultaneously on April 28, 2010. (Tr. at 12, 20, 45).

### A.    Search of Williams's Residence

S.A. Hudgens, along with approximately six other federal agents, a seized property specialist, and a uniformed Fridley police officer, arrived at Williams's residence to execute a search warrant in the evening. (Tr. at 12–13, 22). The police officer and all of the agents were

---

[2]    The Government objected to the testimony of S.A. Boyle, arguing that his testimony regarding the search of Dynamic Group Coon Rapids location was unnecessary and irrelevant because whether Williams's had a privacy interest sufficient to challenge the search could be determined exclusively on the briefing and Government Exhibits 1–3. (Tr. at 38–41). The testimony proceeded over the objection of the Government for purposes of expediency and efficiency, and to create a fulsome record. (*Id.* at 43).

armed and wore jackets bearing law enforcement insignia.[3] (*Id.* at 15, 24). They parked three or four cars in front of the home and, while the Fridley officer remained outside for security, S.A. Hudgens and the agents approached the house. (*Id.* at 21–22). The agents found the front door locked and attempted a knock-and-announce entry. (*Id.* at 20). Because no one answered, the agents used a battering ram to break the handle, lock, and frame of the front door to gain access to Williams's home and began the search.[4] (*Id.* at 20, 21, 23).

Williams arrived home while the search was in progress and met S.A. Hudgens inside. (*Id.* at 13–14, 22). After Williams told him he had been drinking at a local bar, S.A. Hudgens explained why he and the other agents were at Williams's home and what they were looking for. (*Id.* at 13–14, 25). He showed Williams his badge and a copy of the search warrant. (*Id.* at 25). He also informed Williams of the purportedly incriminating evidence found in the search thus far. (*Id.*). S.A. Hudgens testified that Williams appeared upset when advised of this. (*Id.*).

S.A. Hudgens asked Williams if he would consent to speak with him and answer some questions. (*Id.* at 14). He explained to Williams that the decision was voluntary. (*Id.*). He never told Williams he was required to speak with him. (*Id.*). Nor did he make any threats or promises to Williams. (*Id.* at 14–15). Williams agreed. (*Id.* at 15).

S.A. Hudgens and Williams spent approximately thirty minutes to one hour together, with questioning lasting a maximum of forty-five minutes. (*Id.* at 13, 17). They sat in Williams's living room, approximately ten to fifteen feet from the front door. (*Id.* at 15, 23). As S.A. Hudgens interviewed Williams, the other law enforcement officers continued to search his

---

[3]     S.A. Hudgens testified that the jackets most likely bore the ICE insignia. (*Id.* at 24). He also explained that while agents typically enter a home wearing the jacket, they typically remove it after clearing the house. (*Id.*).
[4]     S.A. Hudgens testified that he could not recall whether the officers attempted to reach Williams on his cellphone before using the battering ram. (*Id.* at 20).

home. (*Id.* at 23). S.A. Hudgens could not recall if the items eventually seized from Williams's home were removed during or after the interview. (*Id.* at 23–24).

During the interview, Williams admitted to accessing and viewing child pornography websites. (*Id.* at 17). He explained that he accessed the websites from his home desktop computer and his work-issued laptop. (*Id.*). Agents asked Williams where his work-issued laptop could be found. (*Id.* at 17, 26–27). William said it was in his car, prompting S.A. Hudgens to ask for permission to search the car and recover the laptop. (*Id.*). He did not make any threats or promises to Williams, nor did he raise his voice. (*Id.* at 17–18). In response to S.A. Hudgens's request, Williams asked him some questions, but S.A. Hudgens testified he could not recall the questions. (*Id.* at 27). Williams signed a Consent-to-Search Form at approximately 7:45 p.m. (Gov't Ex. 4); (Tr. at 18, 28). Agents then searched his car and seized the laptop. (Tr. at 28–29). S.A. Hudgens could not recall whether Williams's vehicle was in the driveway or parked on the street at the end of the driveway. (*Id.* at 22, 23, 27). Officers secured the laptop in an evidence vault and applied for a search warrant to review its contents, which was later issued. (*Id.* at 29).

Despite having been at a bar prior to the interview, Williams did not appear intoxicated. (*Id.* at 13). Williams spoke clearly, was coherent, and appeared to understand what was going on. (*Id.* at 13–14, 15). S.A. Hudgens did not recall Williams stopping the interview or asking to speak with an attorney. (*Id.* at 16). S.A. Hudgens testified Williams was free to move about and was not restrained. (*Id.*). He also testified that he offered Williams the opportunity to use the restroom or get a glass of water, recalling that Williams availed himself of the offer for water. (*Id.* at 16, 25). S.A. Hudgens never told Williams he was under arrest and explicitly stated that he was not under arrest. (*Id.* at 16–17, 25–26, 28–29). S.A. Hudgens testified that he never

raised his voice while questioning Williams. (*Id.* at 15–16).

## B. Search of Dynamic Group Precision Molds and Molding, 9553 Foley Boulevard, Coon Rapids, Minnesota

At 5:30 p.m. on the same day, S.A. Boyle and another agent entered the Dynamic Group building in Coon Rapids. (Def.'s Ex. 1 at 2); (Tr. at 45). One of the company's employees met them. (Tr. at 45–46). S.A. Boyle identified himself and explained they were there to execute a search warrant for child pornography and that Williams was the subject of their investigation. (*Id.* at 45). The employee read the search warrant, but was not given a copy. (*Id.* at 45, 55). S.A. Boyle then asked the employee to request Dynamic Group's owner and information technology (IT) specialist come to the Coon Rapids location as soon as possible. (*Id.* at 45–46). Dynamic Group's president, Peter McGillivary, and his son, Joe McGillivary, the company's IT specialist, arrived at approximately 6:00 p.m. (Def.'s Ex. 1 at 2); (Tr. at 45–46).

S.A. Boyle again explained his presence and gave the Peter McGillivary a copy of the search warrant. (Tr. at 46, 55–56). Peter McGillivary said he would cooperate and instructed his son to do the same to assist the agents in accessing the company's computer system. (*Id.* at 46–47, 72–73). None of the agents raised their voices or made any threats or promises to the McGillivarys to obtain consent or compliance. (*Id.* at 48–49, 73–74).

Consistent with Peter McGillivary's instruction and in response to the agents' request, Joe McGillivary led two computer forensic agents into a conference room, logged into the company's system on a laptop, and accessed the network to assist agents in obtaining information related to Williams. (*Id.* at 48, 57, 72–73). S.A. Boyle testified that he was told there were servers at each of Dynamic Group's two locations, in Coon Rapids and Ramsey,

which comprised the company's integrated computer system.[5]  (*Id.* at 47, 57, 58, 74).  He also testified that a Dynamic Group employee told him the Coon Rapids location had an older server, but data relevant to the search warrant would be on both servers.[6]  (*Id.* at 47, 57, 58).

Joe McGillivary and the agents accessed both servers from the Coon Rapids location. (*Id.* at 58–59).  Williams's login was disabled to prevent tampering with the contents during the search.  (*Id.* at 62).  Utilizing administrative privileges, Joe McGillivary overrode Williams's passwords for various accounts.  (*Id.* at 61–62).  He accessed approximately 1.7 gigabytes of data from Williams's home file, approximately two gigabytes from his email, and approximately 166 megabytes of data from a file transfer protocol ("FTP") link.  (*Id.* at 59–60).  This data was located on the Ramsey server.  (*Id.* at 59, 61).  Joe McGillivary advised the agents he could not retrieve all of the data from the Ramsey server.  (*Id.* at 49, 60–61).  Nevertheless, he explained, if the agents went to the Ramsey location with him, they would be able to access all the sought-for data.  (*Id.* at 49).

S.A. Boyle learned Williams had a desk and desktop computer at the Ramsey location. (*Id.* at 47, 49, 62–65).  He told Peter McGillivary that he wished to obtain the hard drive from Williams's desktop computer and asked him to sign a Consent-to-Search Form to search the Ramsey location.  (*Id.* at 49).  None of the agents raised his or her voice or made any threats or promises in making this request.  (*Id.* at 50, 54).

---

[5]    Dynamic Group's facilities are occasionally referred to by their street addresses in the transcript from the hearing.  The Coon Rapids location is on Foley Street, (*Id.* at 41, 42, 54, 55, 57, 62, 66), and the Ramsey location is on Unity Street (*Id.* at 47, 49, 57, 62, 64, 65, 66, 72).  For purposes of clarity, this Report and Recommendation refers to the facilities by cities in which they are located (i.e., Dynamic Group Coon Rapids location and Ramsey location).
[6]    S.A. Boyle testified that the ICE agents could have logged into the server without Joe McGillivary's assistance, but it would have been more difficult and time consuming.  (*Id.* at 48).

At the time of the request to consent to search the Ramsey facility, Peter McGillivary was aware that evidence related to the allegations in the search warrant had been obtained. (*Id.* at 70). He asked to speak with his attorney and, following that private phone conversation, Dynamic Group's attorney had some questions about the scope of the search. (*Id.* at 50, 70). Specifically, the attorney expressed concern about trade secrets and other sensitive business information. (*Id.* at 50–51). S.A. Boyle assured counsel that the agents were not interested in such information and that the scope of the warrant was limited to records and emails relating to Williams. (*Id.*). He further explained that, with the help of Joe McGillivary, the agents could obtain the items listed in the warrant. (*Id.* at 51). Dynamic Group's attorney stated he was satisfied with S.A. Boyle's answers and Peter McGillivary signed an ICE Consent-to-Search Form at the direction of the attorney. (Gov't Ex. 6); (Tr. at 51, 53). Ultimately, nothing was seized from Dynamic Group Coon Rapids location. (Gov't Ex. 5 at 2); (Tr. at 54–55, 68).

C.    **Search of Dynamic Group Precision Molds and Molding, 13911Unity Street NW, Ramsey, Minnesota**

Upon arrival at the Ramsey facility, Joe McGillivary transferred four gigabytes of data from the server to an ICE-owned external hard drive. (Tr. at 67, 70–71). This data included the Williams home folder, the email file, and a copy of the FTP link. (*Id.* at 67). The agents also seized and inventoried the desktop computer believed to be used by Williams. (*Id.* at 71). The inventory from the search at the Ramsey location lists the hard drive and data as the only items seized at approximately 9:15 p.m. (Gov't Ex. 5 at 3). The agents never obtained a search warrant for the Dynamic Group's Ramsey location. (Tr. at 62).

**D.      Dynamic Group's Policy Governing Computer Use**

Dynamic Group's Employee Handbook governs employees' use of issued laptops.  It states, in relevant part,

> When using any of the automation systems, please remember that it is Company property, the same as any of the machines in the shop area.  It is intended for carrying out Company business.  These systems are not to be used to create, access or download any offensive or disruptive materials.  Among those which are considered offensive are any materials which contain sexual implications, pornographic substance, racial slurs, gender-specific comments, or any other comment that offensive addresses someone's age, sexual orientation, religious or political beliefs, national origin, or disability.

> [Dynamic Group] has the right to view electronic mail, server and computer files or sites accessed via the Internet at any time, with or without reason, and examine the contents.  Notwithstanding the Company's right to retrieve and read any electronic mail messages, such messages should be treated as confidential by other employees and accessed only by the intended recipient.  Employees are not authorized to retrieve or read any e-mail messages that are not sent to them.

> . . .   Any employee who violates this policy or uses any automation system for improper purposes shall be subject to disciplinary action, up to and including termination.

(Gov't Ex. 1 at 20); (Gov't Ex. 2).  The Handbook also provided that "[b]rief and occasional personal use of the electronic mail system or Internet is acceptable so long as it is not excessive or inappropriate and occurs during personal time (lunch or other breaks).  (Gov't Ex. 1 at 20); (Gov't Ex. 2).

Williams signed the Employee Acknowledgement in recognition of his receipt of the Employee Handbook and responsibility to read and comply with the "policies, practices, and rules of employment" of Dynamic Group, including a section specifically acknowledging receipt of Dynamic Group's Automation Systems Policy.  (Gov't Ex. 3 at 1–2).

## III.    DISCUSSION

Williams has not challenged the warrant executed in the search of his home.  Nor does he challenge the search warrant for Dynamic Group's Coon Rapids location or the authority of Peter McGillivary to consent to a search of the Ramsey location.[7]  Rather, Williams seeks to exclude three categories of evidence: (1) his statements to ICE agents at his home; (2) the laptop computer issued by Dynamic Group to Williams, which was recovered from his car following the interview in his home; and (3) evidence obtained from Dynamic Group's Ramsey server. The Court finds the interrogation at Williams's home was custodial and, further, his statements and consent to search his vehicle were involuntary.  Thus, the Court recommends suppression of Williams's statements and the laptop as fruits of the interrogation.  To the extent William's Motions seek suppression of the data seized from the Ramsey server and the hard drive from Williams's desktop computer, the Court recommends denial of Williams's Motion because Peter McGillivary provided sufficient consent.

### A.    Interrogation at Williams's Residence

The Court first considers Williams's arguments regarding the interrogation at his home. Williams claims he was not Mirandized as the circumstances required; therefore, he asserts, his statements to S.A. Hudgens should be suppressed.  (Mem. in Supp. of Mots. to Suppress Evidence Seized in Violation of the Fourth and Fifth Amendments, "Def.'s Reply Mem.") [Doc. No. 34 at 10–12]).  Next, Williams argues that because his statements and consent to search his vehicle were involuntary, the fruit of the search—the laptop—ought to be suppressed.  (*Id.* at 13).

---

[7]    Because Williams does not challenge the search warrants, they are presumed valid for purposes of this analysis.

Based on the totality of the circumstances, Williams was in custody on the evening of April 28, 2010 during the interview with S.A. Hudgens at his home. Consequently, because officers failed to advise Williams of his *Miranda* rights, his incriminating statements should be suppressed. Furthermore, the circumstances surrounding the interrogation were inherently coercive, such that no reasonable suspect could have voluntarily provided statements or consented to a search. Thus, William's statements and consent, as well as the laptop, should be suppressed on this alternative basis.

**1.      Williams Was in Custody for *Miranda* Purposes**

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In *Miranda v. Arizona*, the Supreme Court adopted measures to ensure that a suspect is advised of his or her Fifth Amendment rights before custodial interrogations. 384 U.S. 436, 444–45 (1966). Consequently, *Miranda* prohibits the government from introducing evidence of a defendant's statements made during a custodial interrogation, unless the defendant has been previously advised of the Fifth Amendment's privileges against self-incrimination and right to an attorney. *United States v. Chipps*, 410 F.3d 438, 445 (8th Cir. 2005) (citing *Miranda*, 384 U.S. at 444). Nevertheless, law enforcement officers "are not required to administer *Miranda* warnings to everyone whom they question." *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977). *Miranda*'s requirements are applicable only where a person has been "taken into custody or otherwise deprived of his freedom of action in any significant way." *Stanbury v. California*, 511 U.S. 318, 322 (1994) (quoting *Miranda*, 384 U.S. at 444).

"Two discrete inquiries are essential to the [custody] determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *United States v. Lebrun*, 363 F.3d 715, 720 (8th Cir. 2004) (citing *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)). "Thus, the critical inquiry is not whether the interview took place in a coercive or police dominated environment [like a police station], but rather whether the defendant's 'freedom to depart was restricted in any way.'" *Id.* (quoting *Mathiason*, 429 U.S. at 495). To answer this question, courts consider the totality of the circumstances, "keeping in mind that the determination is based 'on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned.'" *Id.* (quoting *Stansbury*, 511 U.S. at 322–23).

The Eighth Circuit explicitly considers six factors to determine whether a suspect is in custody:

> (1) Whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive strategies were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or (6) whether the suspect was placed under arrest at the termination of the questioning.

*United States v. Sanchez*, 676 F.3d 627, 630 (8th Cir. 2012) (citing *United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990)). "The first three indicia are mitigating factors which, if present, mitigate against the existence of custody at the time of questioning. Conversely, the last three indicia are aggravating factors which, if present, aggravate the existence of custody." *United States v. Axsom*, 289 F.3d 496, 500–01 (8th Cir. 2002). None of the *Griffin* factors is dispositive,

and a particularly strong showing on one factor may compensate for a deficiency on another factor. *Griffin*, 922 F.2d at 1349. Moreover, the factors are not exclusive. *Id.* After evaluating the totality of the circumstances, including the *Griffin* factors, the Court concludes Williams was "in custody" within the meaning of *Miranda* during the interrogation at his home.

Courts in this Circuit have generally been disinclined to find an interrogation in a suspect's home constitutes custody for purposes of the Fifth Amendment. *United States v. Czichray*, 378 F.3d 822, 826–27 (8th Cir. 2004) (citing several Eighth Circuit cases for the proposition that "[w]hen a person is questioned 'on his own turf' we have observed repeatedly that the surroundings are 'not indicative of the type of inherently coercive setting that normally accompanies a custodial interrogation.'" (citations omitted)); *United States v. Sayers*, No. 12-cr-273 (RHK/LIB), 2013 WL 791798, at *5 (D. Minn. Feb. 6, 2013) ("[I]n the Eighth Circuit there is a presumption that an interview in the defendant's home is not police dominated."). Simply put, the Court of Appeals in this Circuit believes the element of compulsion that so vexed the *Miranda* court is less likely to be present when a suspect is in familiar surroundings like their home. *See Czichray*, 378 F.3d at 826–27.

Nevertheless, the *Miranda* court did not except in-home interrogations. Rather, it held that warnings were required where there is a formal arrest or certain salient characteristics transform the situation into one in which the suspect was "otherwise deprived of his freedom of action" to the degree associated with a formal arrest. *Miranda*, 384 U.S. at 445. Where the situation is one of "incommunicado interrogation of individuals in a police-dominated atmosphere," *Id.* at 445, and the suspect does not feel free to terminate the encounter, *Thompson*, 516 U.S. at 112, it is custody and law enforcement must provide the *Miranda* warning. Thus, an interrogation in a suspect's home may be custodial under certain circumstances. *See Orozco v.*

*Texas*, 394 U.S. 324, 325–27 (1969) (holding that an interrogation was custodial where four police officers arrived at the suspect's home, entered the bedroom, and behaved as though the suspect was not free to leave while he was questioned); *Griffin*, 922 F.2d at 1354–55 (in-home interrogation custodial where agents took control of the scene and isolated the suspect from his family). Conversely, interrogation that occurs at the police station or jailhouse may be non-custodial. *Mathiason*, 429 U.S. at 494–95 (holding a suspect was not in custody even though questioned at police station); *United States v. Jorgensen*, 871 F.2d 725, 728–29 (8th Cir. 1989) (holding a suspect was not in custody when questioned at F.B.I. offices); *see also Lebrun*, 363 F.3d at 723 ("[W]here there is no clear indication that the defendant's freedom to depart has been restricted, we have typically concluded that a police station interview was noncustodial.").

The Eighth Circuit recognized this principle in *Griffin*, finding "[a]ny objective reasonable person" in the defendant's shoes could reasonably conclude they were in custody based on the police-dominated atmosphere within his home:

> It is the accepted logic that an interrogation in familiar surroundings such as one's home softens the hard aspects of police interrogation and moderates a suspect's sense of being held in custody. *Miranda*, 384 U.S. at 450. **Nonetheless, it is not difficult to envision that a suspect's sense of captivity can actually be intensified by the intrusive and intimidating environment created when agents of the law take control of a person's private residence. After all, a person can not reasonably expect to be free anywhere if not within the refuge of his home.**

*Griffin*, 922 F.2d at 1355 n.15 (emphasis added).

The instant case presents analytical nuances that differentiate it from the cases cited in support of the presumption that in-home interrogations are non-custodial. *See Sayers*, 2013 WL 791798, at *5. Specifically, because of the force used to enter his home and the number of armed agents found in and around his house, Williams reasonably may not have felt free to end the interview and leave. Further, unlike most of the cases previously analyzed in this Circuit, if

Williams chose to end the interview, he could not have asked officers to leave— a search warrant authorized their presence. He may not have felt free to terminate the interview if he knew he could not ask interrogators to leave his home and he could not set limits on their presence in his home or their search. The issue here, therefore, is how to apply the traditional *Miranda* analysis to an in-home interrogation conducted after the suspect happened upon his home to find at least eight law enforcement officers executing a search warrant after breaking down his door with a battering ram.

Consistent with the approach in this Circuit, the Court considers the *Griffin* factors as helpful guides, but bases its ultimate recommendation on the totality of the circumstances. *United States v. Rakotojoelinandrasana*, No. 10-cr-136 (MJD/FLN), 2010 WL 4025068, at *6 (D. Minn. Aug. 2, 2010) (citations omitted). Whether the interrogation was a police-dominated atmosphere influences this recommendation significantly. Reviewing the instant case and precedent in this Circuit, this Court concludes that the interrogation was so police-dominated that Williams was "deprived of his freedom of action," and would not have felt free to terminate the interrogation and leave. *See Miranda*, 384 U.S. at 445.

The law enforcement presence in Williams's home bears heavily on this custody determination. The usual inquiry about whether Williams reasonably believed he could end the interrogation and leave does not capture the uniqueness of an interrogation in his home during the execution of a search warrant. The Supreme Court consistently recognizes the sanctity of the home. *See Florida v. Jardines*, --- S.Ct. ----, 2013 WL 1196577 (U.S. Mar. 26, 2013) (discussing the Fourth Amendment and noting that "[a]t Amendment's 'very core' stands 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" (citation omitted)). The Fourth and Fifth Amendments of the United States

Constitution have been described as core protections against "governmental invasions 'of the sanctity of a man's home and the privacies of life'" which "'affect the very essence of constitutional liberty and security.'" *Griswold v. Connecticut*, 381 U.S. 479, 484 & 484 n.* (1965) (quoting *Boyd v. United States*, 116 U.S. 616, 630 (1886)). These two amendments reflect "supplementing phases of the same constitutional purpose—to maintain inviolate large areas of personal privacy." *Feldman v. United States*, 322 U.S. 487, 489–90 (1944). There is no place more constitutionally sacred than the home. Although a valid search warrant supported by probable cause allays concerns of unimpeded governmental intrusion into citizens' homes, it does not eliminate the violation felt by suspect from the invasion of their home. A reasonable person may have a different understanding of his "freedom to leave" an interrogation in his home during the execution of a search warrant. In addition, the following facts lead the Court to conclude the interrogation in Williams's home became so police dominated that no reasonable person would have felt free to terminate the encounter and leave.

First, the Court notes the law enforcement officers' forced entry with a battering ram. When an individual returning to his or her private residence finds law enforcement officers have broken the handle, lock, and frame to the home's front door to execute a search warrant, it reasonable for that person to assume the officers have taken control of the home. Similarly, it is reasonable, and accurate, for that homeowner to assume his willingness to consent to a search of his home is irrelevant.

Second, the Court notes the number of law enforcement personnel in Williams's home and that each was armed. When a suspect enters his home to find he is outnumbered nearly ten-fold by law enforcement officers, the suspect may reasonably believe he cannot control his movement within his own dwelling. There is no ideal ratio of law enforcement officers to

suspects because that is but one factor considered in a custody determination. Visibly armed law enforcement officers who vastly outnumber a suspect, however, go a long way to making a suspect's home a police-dominated atmosphere. *See United States v. Craighead*, 539 F.3d 1073, 1084–85 (9th Cir. 2008) (eight law enforcement officers from three agencies in suspect's home contributed to police-dominated environment); *United States v. Mittel-Carey*, 493 F.3d 36, 38, 40 (1st Cir. 2007) (finding presence of eight officers in the home, one of whom unholstered his gun, contributed to a police-dominated environment); *United States v. Revels*, 510 F.3d 1269, 1275 (10th Cir. 2007) (seven officers from two different agencies contributed to a police-dominated environment); *Sprosty v. Buchler*, 79 F.3d 635, 638, 641–42 (7th Cir. 1996) (five officers, one of whom was visibly armed and in uniform, who surrounded the suspect in two police cars contributed to a police-dominated environment). Further, where each of the officers is visibly armed, a suspect may reasonably believe his home is under the forcible control of the law enforcement agents.

Third, the Court notes the uniformed officer and marked car from the local police department posted outside Williams's home. Although this officer remained outside the home and was present for the appropriate purpose of security, a reasonable person in Williams's position could have considered the presence as indicium of custody. Even if the federal agents inside his home told Williams he could leave and he chose to do so, it was reasonable for Williams to conclude that this officer would have stopped him and that his "choice" was illusory.

The Court acknowledges some of the mitigating *Griffin* factors were present in this situation, but cannot conclude that they overcome the conclusion that Williams was in custody under these circumstances. The first factor asks whether the defendant was told the interview was voluntary, he was free to leave, and he was not under arrest. *Griffin*, 922 F.2d at 1349. An

explicit assertion that the defendant may end the encounter provides "a clear understanding of his or her rights and generally removes any custodial trappings from the questioning." *United States v. Ollie*, 442 F.3d 1135, 1138 (8th Cir. 2006) (citing *Czichray*, 378 F.3d at 826). Indeed, one court noted, "[n]o governing precedent of the Supreme Court or the Eighth Circuit has yet held that a person was in custody after being clearly advised of his freedom to leave or terminate questioning." *United States v. Serabia-Ferrel*, No. 11-cr-174 (DSD/FLN), 2011 WL 3625147, at *5 (D. Minn. Jul. 8, 2011) (citation and quotation marks omitted); *see also United States v. Elzahabi*, 557 F.3d 879, 884 (8th Cir. 2009) ("An explicit assertion that the defendant may end the encounter generally removes any custodial trappings from the questioning.") (quotation omitted), *cert. denied*, 129 S.Ct. 2781 (2009).

This Court does not find that "perfect record" to be a source of pride. Rather, such a record creates only deep concern over what remains of *Miranda*'s guarantees if the mere mention of voluntariness automatically negates the consideration of the context of the interrogation and results in *per se* non-custodial determinations. The *Miranda* test for custody does not ask whether the suspect was *told* he or she was free to leave; the test asks whether "a reasonable person [would] have *felt* he or she was not at liberty to terminate the interrogation and leave." *Thompson*, 516 U.S. at 112 (emphasis added). "[T]he circumstances of each case must certainly influence a determination of whether a suspect is 'in custody' for purposes of receiving of [sic] *Miranda* protection, the ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (quotation omitted). Accordingly, courts must consider the delivery of these statements within the context of the scene as a whole. Context and actions can outweigh words for purposes of a custody determination. Despite the record in this Circuit, the mere

recitation of the statement that the suspect's participation is voluntary, or that he or she is free to leave or terminate the interview does not necessarily render an interrogation non-custodial.

S.A. Hudgens testified that he told Williams that the interview was voluntary and he was not under arrest. (Tr. at. 14–15, 16–17, 25–26). Nevertheless, those warnings are not determinative. As explained above, the context surrounding those statements leads to the conclusion that, despite the warning that his participation in the interrogation was voluntary, Williams reasonably believed he was not free to terminate the interrogation and leave.

Regarding the third *Griffin* factor—whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions—this case presents a unique set of facts. Some cases suggest that when law enforcement authorities instigate the interaction with a suspect, custody is more likely to exist. *See Griffin*, 922 F.2d at 1351 (citations omitted). On one hand, it may be said agents initiated contact by entering Williams's home to execute the search warrant. On the other, it may be argued Williams voluntarily acquiesced by agreeing to speak with the officers. Regardless, even assuming Williams initiated contact by consenting to speak to S.A. Hudgens, the fact that the officers' presence was authorized by a search warrant must weigh in to the custody determination.

As *United States v. Sayers* suggests, the third *Griffin* factor should be analyzed differently when officers arrive at a suspect's home and are invited in, versus when a suspect arrives to find officers already in his home. *Sayers*, No. 12-cr-273 (RHK/LIB), 2013 WL 791798, at* 3–4 (D. Minn. Feb. 6, 2013) (distinguishing *Griffin* because "the defendant arrived home to find [FBI] agents . . . already inside," among other things). By the time Williams "voluntarily acquiesced" to speak to S.A. Hudgens in his living room, the situation had already become police dominated—Williams already felt the restraint on his freedom caused by the

uniformed officer outside his home, the force used to break his front door in, the presence of at least eight armed federal agents executing a search warrant and combing through his most constitutionally protected, personal space. No reasonable suspect in that position could voluntarily acquiesce to agents' requests to respond to questions. Nor would a reasonable person feel free to leave his home in that situation.

As for the remaining *Griffin* factors, within the context of the totality of the circumstances, they do not overcome the conditions described above that suggest custody. They are noted here, however, to provide analysis of the full context of the interrogation. Williams was not handcuffed or physically restrained. (Tr. at 16). Indeed, he availed himself of the offer to get a glass of water, and nothing in the record suggests he was escorted or supervised. Similarly, there is no evidence that the agents employed any deceptive strategies, strong-arm tactics, or even raised their voices, at any time during the interview. Williams was not arrested at the end of the interview. *See United States v. Galceran*, 301 F.3d 927, 931 (8th Cir. 2002) (stating that the lack of arrest is a "very important factor weighing against custody"). In addition, though not listed as a separate factor, many courts note the length of an interrogation. At thirty to forty-five minutes, the interview was not unduly long. (Tr. at 17); *see Jenner v. Smith*, 982 F.2d 329, 334 (8th Cir. 1993) (stating that a six- or seven-hour interview was not intrinsically unconstitutional). Nevertheless, the Court concludes the police-dominated atmosphere outweighs the presence or absence of factors that otherwise suggest a non-custodial interrogation. A suspect in Williams's shoes would reasonably conclude he was not at liberty to terminate the interrogation and leave.

Despite reaching this conclusion based on the facts in this particular case, the Court takes a moment to consider and distinguish this situation from two seemingly determinative cases: *United States v. Czichray* and *United States v. Durand*. In *Czichray*, two agents arrived at the defendant's home, were invited in, and interviewed him for seven hours beginning at 6:30 in the morning. 378 F.3d at 825. During the interview, the agents did not allow Czichray to move freely about his home, told him to call in sick to work, and directed him not to tell anyone about the investigation. *Id.* When the phone rang, the agents instructed Czichray not to answer and informed him they would "light up his world" if he did not cooperate. *Id.* The agents also told the defendant several times that he was free to terminate the interview. *Id.* Czichray never asked the agents to leave and did not resist the questioning. *Id.*

A divided panel of the Eighth Circuit ultimately determined that the defendant was not in custody during the interview.[8] *Id.* at 830. Given the non-custodial determination in spite of the nature of the officers' conduct in *Czichray*, it is worth highlighting the distinctions between *Czichray* and the this case. First, in reaching its conclusion, the *Czichray* court relied heavily on the fact that Czichray was interviewed in the familiar surroundings of his home. *Id.* at 829, 830. As noted at the outset of this analysis, custody determinations are based on the totality of the circumstances, and this Court rejects the presumption that in-home interrogations are *per se* non-custodial.[9] *See Sanchez*, 676 F.3d at 630–31 (citation omitted). Furthermore, unlike Williams, Czichray invited the two officers into his home. Williams arrived home to find his front door busted in by a battering ram, a uniformed police officer and marked car outside his home, and at least eight agents searching through his home.

---

[8]    Five of the eleven judges of the Eighth Circuit would have voted to grant Czichray's petition for rehearing en banc. 378 F.3d at 822.

[9]    See discussion on page 12–15.

The *Czichray* court also relied on its finding that it was "not a case where a suspect sought to exercise his option of terminating the interview, only to meet resistance from his interrogators." *Id.* at 829. *Czichray* specifically noted that, at the conclusion of the interview, the FBI agents made good on their promise to let Czichray go about his business. *Id.* at 825. Czichray was not arrested until weeks after the interview. *Id.* Williams, however, could not ask the officers to leave. The agents were there legally to execute a search warrant. Even if Williams felt free to terminate the interview and asked the officers to leave, they would not have left. This fundamental fact distinguishes the two cases.

Although *United States v. Durand* may seem comparable to this case at first blush, it also is distinguishable. There, law enforcement officers arrived at Durand's home to execute a search warrant, knocked on the door, and placed him in handcuffs immediately upon his opening the door. 2011 WL 5444112, at *1. Altogether, thirteen law enforcement officers were at Durand's residence that day, including a uniformed officer in a marked car. *Id.* at *1 n.4. The officers told Durand he was not under arrest and they were attempting to secure the home. *Id.* at *1. After approximately ten minutes, the officers were advised the residence was clear and removed Durand's handcuffs. *Id.* at*2. At that time, Durand walked inside ahead of the agents. *Id.* He took a seat at the dining room table, flanked by armed officers. *Id.* The officers told Durand he was the target of the Federal Grand Jury investigation, he was not under arrest, he was free to leave, and he did not have to speak if he did not want to. *Id.* The agents also told Durand that his wife, who was also home at the time, was not under arrest and was not a target of the investigation. *Id.* At that point, Durand stated, "I am glad you guys are here. I wanted to talk to you. I have done nothing wrong and I was deceived by Cook, Trevor Cook." *Id.*

The agents decided to speak with Durand, who asked whether he needed at attorney. *Id.* at *3. The agents told Durand they could not give him advice on that matter, but he was welcome to contact his attorney if he chose and that, if he wanted to contact his attorney, their discussions would cease. *Id.* Durand said that he would like to know the questions that were going to be asked of him before he would contact an attorney. *Id.* He then pointed to some documents on the table, stating that he had an appointment set up with his accountant that day to prepare his 2009 tax returns, and all of his documents were right there. *Id.* The agents continued their interview for approximately twenty minutes, asking "a couple more times whether [Durand] needed an attorney." *Id.* At some point, Durand did state that he was going to call his attorney, which he did. *Id.* The interview then ceased. *Id.* Sometime thereafter, either Durand or his wife asked to talk with the other. *Id.* The agents let the two of them talk to each other in the kitchen. *Id.* The Durands then asked if they could leave. *Id.* The agents told them yes and the two of them left. *Id.*

On a motion to suppress Durand's statements, the court concluded under the totality of the circumstances, including analysis of the *Griffin* factors, Durand was not in custody during the interview. *Id.* at *7. In doing so, the court specifically commented on the impact of the execution of the search warrant on the finding of custody:

> Furthermore, the Court finds no grounds to conclude that the existence of certain circumstances inherent to the execution of a search warrant (i.e., initially handcuffing Mr. Durand during the protective sweep when they had information that Mr. Durand may be carrying a weapon and moving Defendant's wife into the living room to ensure a secure scene and officer safety), can properly be equated to indicia of custody. *Cf. United States v. Walker*, 555 F.3d 716, 721 (8th Cir. 2009) ("Protective searches allow for the use of handcuffs.")[.] Although the sudden appearance of numerous agents wearing FBI or IRS jackets at one's home is obviously intimidating, this circumstance is typical of a search-warrant execution. Essentially this circumstance relates to nuances of whether there was a police-dominated atmosphere, use of deception and strong-arm tactics, and voluntary acquiescence to an interview. Here, the sudden arrival of FBI and IRS

> agents simply does not outweigh the objective, undisputed facts that indicate the absence of a custodial situation. *See Czichray*, 378 F.3d at 828. Placing Mr. Durand in handcuffs and having his wife sit in the living room during the initial security sweep is not indicative of Defendant's custody, but rather is simply the cautious—and reasonable—conduct that would be expected in the execution of a lawful search warrant in a private residence.

*Id.* Nevertheless, the "circumstances inherent in the execution of a search warrant," including the "sudden appearance of numerous agents" in the defendant's home, was only one of the elements considered for the non-custodial finding in *Durand*. *Id.* Custody determinations for purposes of *Miranda* are based on the totality of the circumstances, and at least four notable reasons distinguish *Durand* from this case. *See Sanchez*, 676 F.3d at 630–31 (citation omitted).

First, Durand offered some statements, unsolicited by any of the agents' questions or conduct. *Durand*, 2011 WL 5444112, at *6. Second, upon entering his home, Durand was assured for at least the third time by a different officer that he was not under arrest, that he was free to leave, and did not have to speak with officers. *Id.* Third, Durand welcomed the officers into his home, telling them he was glad they were there and wanted to talk with them. *Id.* Fourth, the agents repeatedly instructed Durand that he could call his attorney if he wanted. *Id.* at *7. Williams's statements were solicited by S.A. Hudgens. Although S.A. Hudgens told Williams his participation was voluntary, he did not repeatedly assure him he was not under arrest or instruct him to call his attorney if he wanted. Finally, Williams did not welcome the officers into his home as Durand did.

The guiding principle for this decision is the Court's role as a vigilant defender and guardian of the Constitution and the rights provided therein. Past decisions have stretched and manipulated *Miranda* in many instances, so that the situations swept under its protective control have been severely limited. If *Miranda* is applied so that interrogations are always non-custodial when they occur within the suspect's home or where suspects are told their participation is

"voluntary," courts fail to consider the totality of the circumstances as required by *Miranda* and gut the decision of its prophylactic protections in those instances.

Although the rulings in this matter with respect to *Miranda* will not leave the Government empty handed, this is an important issue on which to take a stand. In doing so, the Court echoes the lamentations of Justice Brennan in *Colorado v. Connelly*:

> realiz[ing] that, in itself, this order is not a matter of great significance. But even matters of small effect can cloak issues of great moment. In making the specific guarantees of the Bill of Rights a part of our fundamental law, the Framers recognized that limitless state power afflicts the innocent as well as the guilty, that even a crime-free world is not worth the fear and oppression that inevitably follow unrestricted police power, and that a truly free society is one in which every citizen-guilty or innocent-is treated fairly and accorded dignity and respect by the State. Of course, the Framers could not foresee the shape our society would take as the Nation developed. Nor could they foresee how the police function would evolve to keep pace. Rather, it has fallen to this Court—the "ultimate interpreter of the Constitution," *Baker v. Carr*, 369 U.S. 186, 211, 82 S.Ct. 691, 706, 7 L.Ed.2d 663 (1962)—to enforce the rights enshrined in the Bill of Rights and preserve the principles established in 1789. Ours is the duty to prevent encroachment on these principles by over-zealous police in the discharge of their great responsibility to prevent crime. Every law-abiding citizen shares with the Court the belief that the prevention of crime is an essential governmental function. However, the Members of this Court have the special responsibility to recognize that, as essential as is the goal of preventing crime, "the Court must be ever mindful of its primary role as the protector of the citizen and not the warden or the prosecutor." *Florida v. Meyers,* 466 U.S., at 387, 104 S.Ct., at 1856 (STEVENS, J., dissenting).

474 U.S. 1050, 1053 (1986) (memorandum of Brennan, J., joined by Stevens, J.).

The force used to enter the home and the number of armed officers present to execute the search warrant lead the Court to conclude that Williams was in custody for purposes of *Miranda*. Williams's home became a police-dominated atmosphere. The interrogation was custodial and *Miranda* warnings were required. Because the warnings were not given, Williams's self-incriminating statements should be suppressed for failure to comply with *Miranda*.

### 2. William's Statements and Consent to Search His Vehicle Were Not Voluntary

Whether or not *Miranda* is implicated, a confession or incriminating statement must be voluntary to be admissible. *See Dickerson v. United States*, 530 U.S. 428, 433–34 (2000); *United States v. Contreras*, 372 F.3d 974, 977 (8th Cir. 2004). The voluntariness of a defendant's statements or consent is determined by an examination of the totality of the circumstances, including both the conduct of law enforcement in exerting pressure on the defendant and the defendant's ability to resist that pressure. *United States v. Brave Heart*, 397 F.3d 1035, 1040, 1041 (8th Cir. 2005); *Contreras*, 372 F.3d at 977, 978. Some factors this Court may consider in evaluating the totality of the circumstances include: (1) the individual's age and mental ability; (2) whether the individual was intoxicated or under the influence of drugs; (3) whether the individual was informed of his *Miranda* rights; (4) whether the individual was aware, through prior experience, of the protections that the legal system provides for suspected criminals; (5) the length of the detention; (6) whether the police used threats, physical intimidation, or punishment to extract consent; (7) whether the police made promises or misrepresentations; (8) whether the individual was in custody or under arrest when consent was given; (9) whether the consent was given in public or in a secluded location; and (10) whether the individual stood by silently or objected to the search. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973); *United States v. Watters*, 572 F.3d 479, 483 (8th Cir. 2009); *United States v. Arciniega*, 569 F.3d 394, 398 (8th Cir. 2009); *Contreras*, 372 F.3d at 977; *United States v. Bradley*, 234 F.3d 363, 366 (8th Cir. 2000). The government has the burden of proving by a preponderance of the evidence that the defendant's statements, *Brave Heart*, 397 F.3d at 1040, and consent, *United States v. Pape*, --- F. Supp. 2d ----, 2013 WL 68634, at *11 (D. Minn. Jan. 7, 2013), was legally sufficient.

In the instant case, Williams's statements and consent were involuntary due to the surrounding circumstances. Given the force demonstrated to enter his home, that the officers were visibly armed, and the fact that their presence was based on a search warrant, the interrogation was custodial, inherently coercive, and sufficient to cause Williams's will to be overborne. *Dickerson*, 530 U.S. at 434. The same facts establish that Williams's consent to a search of his vehicle was involuntary.[10] Unlike many cases finding consent to search voluntary, Williams did not invite the officers into his home and could not ask them to leave. *See United States v. Downwind*, No. 11-cr-295 (MJD/LIB), 2011 WL 6963611, at *7 (D. Minn. Oct. 25, 2011) (finding consent to search home voluntary because Downwind "gave clear consent for police to enter the home"). The law enforcement officers were executing a legal search warrant; Williams did not invite them into his home and could not require them to leave. Under these circumstances, Williams's statements and consent were not voluntary.

### 3. The "Fruit" of Williams's Statements and Consent Should Be Suppressed

Williams further argues that the laptop seized from his car is derivative of his involuntary statements and consent, and moves for suppression of the evidence as the fruit of an unlawful action by the police. (Gov't Ex. 4); (Def.'s Reply Mem. at 13); *see Wong Sun v. United States*, 371 U.S. 471 (1963). Consistent with the analysis above, Williams's statements and consent were not provided voluntarily. Thus, "fruits" of those statements and consent—the laptop—must

---

[10] Although Williams had been drinking at a bar, intoxication does not factor into this calculus. By all appearances, Williams was not so intoxicated that his ability to voluntarily consent was impacted. According to S.A. Hudgens's testimony, Williams did not appear intoxicated, spoke clearly without slurring his words, understood what was happening and responded appropriately to the agents' questions. (Tr. at 13, 14, 15). There is no evidence to suggest intoxication or any physical or mental impairments that would influence this analysis. Even if there were evidence of intoxication, the mere fact of intoxication does not render consent involuntary. *United States v. Castellanos*, 518 F.3d 965, 969 (8th Cir. 2008).

be suppressed.

**B.     Search of Dynamic Group's Facilities and Computer Server**

Williams claims the search of the Ramsey server was illegal because it exceeded the scope of the warrant.  He seeks to suppress the data and hard drive seized as the fruit of that unlawful search.  The Government argues that Williams lacks "standing" to challenge the search and seizure because he has failed to show any reasonable expectation of privacy.[11] Alternatively, the Government contends the agents obtained valid consent to search the Ramsey server.  For purposes of analysis, the Court assumes Williams has a legitimate privacy interest in the files searched and reaches the consent issue.  Because Peter McGillivary provided consent sufficient to permit a search of the Ramsey server upon his arrival to the Coon Rapids facility, the Court recommends denial of Williams's Motion to the extent he seeks to suppress the data seized from the Dynamic Group's Ramsey server and the desktop hard drive.

**1.     Williams's Expectation of Privacy**

A defendant moving to suppress evidence has the burden of showing a legitimate expectation of privacy in the place or item searched.  *United States v. Pierson*, 219 F.3d 803, 806 (8th Cir. 2000); *United States v. Gomez*, 16 F.3d 254, 256 (8th Cir. 1994) (citations omitted).  To establish a legitimate expectation of privacy necessary to assert a Fourth Amendment violation, a person must have a subjective expectation of privacy and that expectation must be objectively

---

[11]     The concept of Fourth Amendment "standing" is actually not an issue of standing at all, but a matter of substantive Fourth Amendment rights that asks whether a person has a legitimate expectation of privacy with respect to the subject of a challenged search.  *See United States v. Foster*, No. 10-CR-0049 (PJS/JJK), 763 F. Supp. 2d 1086, 1089–90 (D. Minn. 2011); *see also United States v. Green*, 275 F.3d 694, 698 n.3 (8th Cir. 2001) ("[T]he concept of 'standing' has not had a place in Fourth Amendment jurisprudence [since *Rakas v. Illinois*, 439 U.S. 128 (1978)]." (internal quotation marks and citation omitted))

reasonable; that is, one that society is willing to accept. *United States v. McCaster*, 193 F.3d 930, 933 (8th Cir. 1999). Employees may have at least some Fourth Amendment rights in the workplace. *See O'Connor v. Ortega*, 480 U.S. 709, 717 (1987); *Mancusi v. DeForte*, 392 U.S. 364, 369 (1968); *cf. United States v. Chandler*, 197 F.3d 1198, 1200 (8th Cir. 1999) ("employees have reasonable expectations of privacy at work, but employers have legitimate interests that may sometimes justify warrantless searches of the workplace"). The Supreme Court opined recently that employer policies concerning communications "shape the reasonable expectations of employees, especially to the extent that such policies are clearly communicated." *Ontario v. Quon*, 130 S.Ct. 2619, 2630 (2010).

Dynamic Group's policy made it clear that the company had "the right to view electronic mail, server and computer files or sites accessed via the Internet at any time, with or without reason, and examine the contents." (Gov't Ex. 1 at 20); (Gov't Ex. 2). The policy contemplated "[b]rief and occasional personal use of the electronic mail system or Internet," but limited that use to "personal time (lunch or other breaks)" and required that it was "not excessive or inappropriate." (Gov't Ex. 1 at 20); (Gov't Ex. 2). The policy further mandated that the computer systems were "not to be used to create, access or download any offensive or disruptive materials," including "any materials which contain sexual implications[ or] pornographic substance . . . ." (Gov't Ex. 1 at 20); (Gov't Ex. 2). Williams signed acknowledgment of receipt of this policy. (Gov't Ex. 3 at 1–2).

Williams claims he had a privacy expectation in the files searched because they were password protected. (Def.'s Reply Mem. at 5–7). He acknowledges the policy, but argues that "[s]imply because an employee has signed a document permitting their employer to infringe on their expectation of privacy as a condition of their employment does not mean that the employee

is waiving their expectation of privacy and granting the public and law enforcement access." (*Id.* at 6–7). The Government contends that the policy "provides that Dynamic has the right to open and inspect company property, including the server, and to view [William]'s activity on Dynamic's computer network at any time, with or without reason, notice, or consent, and examine the contents." (Def.'s Reply Mem. at 20, 23–24).

"[T]he judiciary risks error by elaborating too fully on the Fourth Amendment implications of emerging technology before its role in society has become clear." *Quon*, 130 S.Ct. at 2629 (citations omitted). Here, as in *Quon*, "[p]rudence counsels caution before the facts in the instant case are used to establish far-reaching premises that define the existence, and extent, of privacy expectations enjoyed by employees when using employer-provided communication devices." *Id.* "A broad holding concerning employees' privacy expectations vis-à-vis employer-provided technological equipment might have implications for future cases that cannot be predicted. It is preferable to dispose of this case on narrower grounds." *Id.* at 2630. For that reason, this Court follows the *Quon* court's lead and assumes several propositions *arguendo*: first, that Williams had a reasonable expectation of privacy to the information stored in his files on Dynamic Group's servers; second, the search of the servers constituted a search within the meaning of the Fourth Amendment; and, third, the principles applicable to a private employer's search of an employee's physical office apply with at least the same force when the employer intrudes on the employee's privacy in the electronic sphere. *See id*.

### 2. Consent to Search Dynamic Group's Computer Server

Williams emphasizes the timing of Peter McGillivary's written consent to search the Ramsey facility, asserting that agents conducted an unlawful search of the Ramsey server prior to that consent. (Def.'s Reply Mem. at 8–10). He argues further that Peter McGillivary's

subsequent consent was not sufficiently attenuated from the allegedly illegal search and, therefore, the data seized must be suppressed. (*Id.* at 9–10). The timing of the agents' search of the Ramsey server in relation the written consent from Peter McGillivary is irrelevant to this Court's analysis because the agents had oral consent to search the Ramsey server. When a search is authorized—either by warrant or consent of an individual with sufficient authority over the property—the scope of the search is limited to the terms of the authorization. *Horton v. California*, 496 U.S. 128, 140 (1990); *United States v. Siwek*, 453 F.3d 1079, 1084–85 (8th Cir. 2006) (citations omitted); *see also Walter v. United States*, 447 U.S. 649, 656 (1980). The scope of consent is what an objectively reasonable person would have understood the consent to include. *United States v. Urbina*, 431 F.3d 305, 310 (8th Cir. 2005).

In this case, the search warrant authorized a search of "Dynamic Group Precision Molds and Molding, located at 9553 Foley Boulevard, Coon Rapids, Minnesota 55433-5596." (Gov't Ex. 5 at 1). Under this authority, federal agents arrived at the Coon Rapids location and asked that Peter McGillivary, the president of the company, meet them. When Peter McGillivary arrived, the agents explained the reason for their presence and presented a copy of the search warrant. (Tr. at 46, 55–56). In response, Peter McGillivary committed himself and Dynamic Group to cooperating with the agents, instructing his son to assist in the search of the computer system. (*Id.* at 46–47, 72–73). He did not impose any limitations or conditions on his cooperation. The agents, and Joe McGillivary, reasonably understood this as consent to search the entire computer network, not simply the Coon Rapids server. Williams does not dispute Peter McGillivary's authority to consent to a search of the computer network and no evidence suggests that consent was involuntary. Because Peter McGillivary's consent at the inception of the search at the Coon Rapids location applied to the entire Dynamic Group computer system,

Williams's arguments regarding purging the taint are unnecessary because the search of the Dynamic Group's Ramsey server was based upon voluntary consent.

## IV.   RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendant Williams's Pretrial Motion to Suppress Evidence from Search and Seizure [Doc. No. 17] be **GRANTED in part** and **DENIED in part** as described above and Pretrial Motion to Suppress Statements, Admissions, and Answers [Doc. No. 18] be **GRANTED**.

Dated: March 27, 2013

*s/ Steven E. Rau*
STEVEN E. RAU
United States Magistrate Judge

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court and serving all parties by **April 10, 2013**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.